# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KEITH CAULEY, M.D., Ph.D., | No. 4:21-CV-00045 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| GEISINGER CLINIC, | |
| Defendant. | |

## MEMORANDUM OPINION

### FEBRUARY 13, 2024

Keith Cauley, M.D., Ph.D., was formerly employed by Geisinger Clinic ("Geisinger") as a neuroradiology associate, until his eventual resignation from Geisinger. Dr. Cauley worked for Geisinger without incident for three and one-half years until, in the summer of 2019, Geisinger conducted an internal peer review that it believed revealed poor performance on the part of Dr. Cauley. Dr. Cauley was placed on administrative leave and subsequently, his attorney and Geisinger negotiated an agreement whereby Dr. Cauley would resign from Geisinger in exchange for Geisinger agreeing to several conditions. Dr. Cauley now alleges that Geisinger failed to honor its obligations under that agreement. However, the evidence is insufficient to establish that Geisinger breached any terms of the agreement and, accordingly, it is entitled to summary judgment in its favor.

## I.    BACKGROUND

In May 2021, Dr. Cauley filed a second amended complaint, raising claims for breach of contract, promissory estoppel, intentional misrepresentation, and defamation.[1] Geisinger later filed a motion to dismiss, seeking dismissal of all claims with the exception of Dr. Cauley's claim for breach of contract.[2]

This Court granted in part and denied in part the motion to dismiss.[3] The Court permitted the claim for promissory estoppel to proceed,[4] but dismissed Dr. Cauley's claims for intentional misrepresentation and defamation.[5] As to the intentional misrepresentation claim, the Court found that the claim was barred by the gist of the action doctrine, since the claim sounded in contract rather than tort.[6] With regard to the defamation claim, this Court determined that the claim failed because (1) Dr. Cauley had not properly alleged who made the purportedly defamatory statements, to whom they were made, or when or where they were made, and (2) Dr. Cauley failed to adequately alleged that the purportedly defamatory statements were made without privilege, or that the privilege was abused.[7] Accordingly, this matter

---

[1]   Doc. 21.
[2]   Doc. 24.
[3]   Docs. 30, 31.
[4]   Doc. 30 at 7-9.
[5]   *Id.* at 9-23.
[6]   *Id.* at 9-13.
[7]   *Id.* at 13-23.

proceeded as to only Dr. Cauley's claims for breach of contract and promissory estoppel.[8]

Geisinger has now filed a motion for summary judgment.[9] Geisinger argues that it is entitled to judgment in its favor as to Dr. Cauley's breach of contract claim for three reasons.[10] First, it asserts that there is no evidence that it provided any adverse employment references to Dr. Cauley's prospective employers.[11] Second, Geisinger contends that it afforded Dr. Cauley numerous opportunities to examine the peer reviews both before and after his resignation, meaning it did not breach that portion of the agreement.[12] Finally, Geisinger notes that it is undisputed that it did not report Dr. Cauley to the National Provider Database ("NPDB").[13] Geisinger also asserts that it is entitled to summary judgment on Dr. Cauley's promissory estoppel claim because it broke no alleged promises to Dr. Cauley, and the evidence demonstrates that Dr. Cauley did not change his position in reliance on any promise.[14]

---

[8]   Dr. Cauley later filed an untimely motion to again amend his complaint, which this Court denied after finding that the proposed amendment was without good cause and would unduly prejudice Geisinger. Docs. 80, 81.

[9]   Doc. 74.

[10]   Doc. 82 at 12-20.

[11]   *Id.* at 12-15.

[12]   *Id.* at 15-17.

[13]   *Id.* at 18.

[14]   *Id.* at 18-20.

Dr. Cauley responds that sufficient facts exist to support a claim for breach of contract or promissory estoppel.[15] Specifically, Dr. Cauley argues that the evidence demonstrates he was never provided the opportunity to examine the peer review records, that his former supervisor gave a negative reference, and circumstantial evidence indicates that another doctor may have spoken poorly of Dr. Cauley to a potential employer.[16] Dr. Cauley further contends that the evidence establishes damages, or his reliance on Geisinger's promise, as he was unable to find steady employment for a significant period of time following his resignation from Geisinger.[17]

Geisinger has filed a reply brief, rendering this matter is ripe for disposition.[18] For the following reasons, the motion for summary judgment will be granted.

## II.   DISCUSSION

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence

---

[15]   Doc. 84.
[16]   *Id.* at 17-24.
[17]   *Id.* at 24-25.
[18]   Doc. 92.
[19]   Fed. R. Civ. P. 56(a).

exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[20] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[21] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[22]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[23] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[24] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[25] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[26]

---

[20]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).

[21]   *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).

[22]   *Id.*

[23]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[24]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[25]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[26]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation marks omitted).

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[27] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[28] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[29] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[30]

### B.    Undisputed Facts

From 2015 until 2019, Dr. Cauley was employed by Geisinger as a neuroradiology associate in Geisinger's department of radiology.[31] Dr. Cauley's employment with Geisinger was largely uneventful until August 2019, when he was summoned to the office of Aalpen Patel, M.D., the chairman of the radiology department.[32] Present at the meeting were Dr. Cauley; Dr. Patel; Dr. Cauley's immediate supervisor and director of neuroradiology, Gino Mongeluzzo, M.D.; vice

---

[27] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[28] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[29] Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[30] Fed. R. Civ. P. 56(c)(3).

[31] Doc. 75 ¶¶ 1, 9.

[32] *Id.* ¶ 2.

chair of operations, Scott Collins, M.D.; and a human resources employee, Amanda Carl.[33]

At that meeting, Geisinger informed Dr. Cauley that he had been placed on administrative suspension as a result of an unfavorable peer review that Geisinger maintained revealed poor performance.[34] During this administrative suspension, an external peer review was conducted on Dr. Cauley's work.[35] The external peer review evidenced similarly poor results.[36]

Following the meeting where Dr. Cauley was placed on administrative leave, he engaged the services of an attorney.[37] In September 2019, Dr. Cauley's attorney and legal counsel for Geisinger negotiated an oral agreement that resulted in Dr. Cauley's resignation from Geisinger.[38] Dr. Cauley alleges that the agreement contained four key obligations on Geisinger's part: (1) permit Dr. Cauley to meet with Dr. Mongeluzzo to examine the peer reviews; (2) provide only neutral references regarding Dr. Cauley's employment; (3) refrain "from conducting any

---

[33]  *Id.* ¶ 4; Doc. 85 ¶¶ 4, 6, 8.

[34]  Doc. 75 ¶¶ 3, 5; Doc. 85 ¶ 10.

[35]  Doc. 75 ¶ 6.

[36]  *Id.* ¶ 7. Although Dr. Cauley contests that the results of the external peer review were poor, Doc. 86 ¶ 7, the deposition testimony to which he cites provides no support for that assertion. Doc. 87-2 at 22. In fact, none of the deposition testimony that Dr. Cauley provides to the Court supports such a denial. *See* Doc. 87-2. In contrast, Geisinger points to deposition testimony that clearly supports its assertion that the results of that review were unfavorable. Doc. 77-4 at 13; Doc. 77-5 at 10.

[37]  Doc. 75 ¶ 8.

[38]  Doc. 75 ¶ 9; Doc. 85 ¶¶ 13-15. For purposes of its motion for summary judgment, Geisinger does not contest that the attorneys formed an agreement—whether a contract or a promise. The Court therefore accepts for purposes of this motion that an agreement was formed.

activity that could result in a report to the NPDB"; and (4) refrain "from including in Dr. Cauley's personnel file anything regarding the peer reviews or negative references."[39]

Subsequent to Dr. Cauley's resignation from Geisinger, he began a lengthy job search. Although Dr. Cauley initially found employment with Virtual Radiology, he voluntarily resigned from that position after approximately three months because Virtual Radiology assigned him to read radiology images that fell outside of his specialty.[40] Following his resignation from Virtual Radiology, Dr. Cauley sought employment with Samaritan Hospital in Watertown, New York, but the position was canceled.[41]

Dr. Cauley thereafter applied for a position with Northwell Health in Staten Island, New York ("Northwell").[42] As part of that application, Geisinger submitted a letter to Northwell confirming the dates that Dr. Cauley had been employed by Geisinger and confirming that he had exercised clinical privileges during his employment.[43] During the hiring process, Northwell's chair of the department of radiology—Jesse Chusid, M.D.—spoke with William Millar, M.D., Geisinger's former director of neuroradiology and Dr. Cauley's supervisor from 2016 until July

---

[39] Doc. 75 ¶ 25.

[40] *Id.* ¶ 11; Doc. 86. ¶ 11.

[41] Doc. 75 ¶ 12.

[42] *Id.* ¶ 13.

[43] *Id.* ¶ 14.

2019; Dr. Millar discussed Dr. Cauley's strengths and weaknesses and opined that Dr. Cauley would not be a good fit with Northwell's demanding and exacting culture.[44] Dr. Cauley was ultimately not hired by Northwell.[45]

Dr. Cauley unsuccessfully sought employment at two more health care facilities before he applied for a position with Tufts Medical Center in Boston, Massachusetts ("Tufts").[46] Dr. Cauley received a contingent offer of employment from Tufts, but was required to provide a reference as part of the credentialing process.[47] Dr. Cauley had listed Dr. Millar as a reference, but Tufts was unable to contact Dr. Millar.[48] Dr. Cauley also listed Christopher G. Filippi, M.D.,[49] then the chairman of radiology at Tufts, as a reference.[50]

Dr. Filippi contacted Dr. Patel through LinkedIn to inquire about his opinion of Dr. Cauley, and Dr. Patel called Dr. Filippi to discuss the matter.[51] Although the conversation regarded Dr. Cauley, Dr. Patel could not remember what was said during the conversation except that, under the circumstances, he knew he "would

---

[44] Doc. 85 ¶¶ 5, 30.

[45] *Id.* ¶ 32.

[46] Doc. 75 ¶¶ 15-17.

[47] Doc. 85 ¶¶ 34-35; Doc. 89 ¶ 34.

[48] *Id.* ¶ 18.

[49] Geisinger spells Dr. Filippi's name "Fillippi" while Dr. Cauley spells his name "Filipi." The available record does not permit the Court to discern which is the correct spelling, so the Court utilizes the spelling used in his deposition transcript—Dr. Filippi. *See* Doc. 77-13.

[50] Doc. 85 ¶ 36.

[51] *Id.* ¶¶ 40-41.

not be able to discuss" specifics as to Dr. Cauley's employment.[52] Dr. Patel did not forward this request for a reference to anyone else at Geisinger.[53]

At some point after the conversation with Dr. Patel, Dr. Filippi called Dr. Cauley and urged him to withdraw his employment application with Tufts.[54] Dr. Filippi did so because Tufts had not secured a reference related to Dr. Cauley's employment as Geisinger and, absent such a reference, Tufts was likely to report Dr. Cauley to the physician database.[55] Dr. Filippi confirms that he never spoke with anyone at Geisinger regarding Dr. Cauley's resignation from Geisinger, had no knowledge of any peer review involving Dr. Cauley, and had no knowledge that Geisinger employees were purportedly not permitted to act as a reference for Dr. Cauley.[56] Dr. Cauley eventually withdrew his application to Tufts.[57]

Although the parties dispute whether Geisinger honored its alleged obligation to provide only a neutral reference,[58] there is no dispute that Geisinger fulfilled the requirement that it not report Dr. Cauley to the NPDB.[59] Moreover, while the evidence is undisputed that Dr. Cauley never actually examined the peer reviews

---

[52] *Id.* ¶ 42; Doc. 87-6 at 24.
[53] Doc. 89 ¶ 46.
[54] Doc. 75 ¶ 19.
[55] Doc. 77-13 at 4-5.
[56] *Id.* at 5-7.
[57] Doc. 75 ¶ 21.
[58] *Compare id.* ¶ 29, *with* Doc. 84 ¶ 29.
[59] Doc. 75 ¶ 28. Dr. Cauley also does not appear to argue that Geisinger included anything in his personnel file related to the peer reviews or negative references. *See* Docs. 21, 84.

prior to this litigation, the evidence establishes that Geisinger provided Dr. Cauley

such opportunities, but he did not avail himself to those opportunities.[60]

### C.   Analysis

#### 1.   Breach of Contract

Geisinger first argues that it is entitled to summary judgment as to Dr.

Cauley's breach of contract claim because it provided no adverse employment

references to Dr. Cauley's prospective employers, and provided him with several

opportunities to inspect the peer reviews.[61] Dr. Cauley contests both assertions.[62]

---

[60]   *Id.* ¶ 30. Dr. Cauley contests this fact, and argues that he was provided no opportunities to examine the peer reviews. Doc. 86 ¶ 30. However, the evidence to which Dr. Cauley cites to support his denial does provide any factual support for his assertion. *See id.* (citing Doc. 85 ¶¶ 16-23). Rather this evidence simply reinforces the undisputed notion that Dr. Cauley did not actually examine the peer reviews prior to receiving them in discovery. In contrast, Geisinger points toward Dr. Patel's unrefuted testimony that a meeting had been arranged for Dr. Cauley to examine the peer reviews, but Dr. Cauley "never showed up." Doc. 77-4 at 12. Geisinger further references the declaration of Cindy Sheridan, a legal officer for Geisinger, who states that Dr. Cauley was twice offered the opportunity to inspect the peer reviews, but "declined those offers." Doc. 77-17. To contradict this evidence, Dr. Cauley cites his own deposition testimony wherein he apparently denied having ever been presented such an opportunity. Doc. 84 at 20. However, the pages of the deposition transcript to which Dr. Cauley cites to support his assertion, *see* Doc. 84 at 20 (citing Dr. Cauley Deposition Transcript at 122-125, 135-136, and 145-147), were not provided to the Court by Dr. Cauley or Geisinger. *See* Docs. 77-3, 87-2, 91-2. Of course, providing this evidence was not Geisinger's responsibility. In the absence of any evidence supporting Dr. Cauley's assertion in his briefing, the Court cannot conclude that even he disputed in his deposition that he was provided the opportunity to review the peer reviews. Consequently, the undisputed evidence demonstrates that Geisinger made the peer reviews available to Dr. Cauley.

[61]   Doc. 82 at 12-17. Geisinger also notes that Dr. Cauley cannot sustain this claim on the ground that Geisinger reported him to the NPDB. *Id.* at 18. Since it is uncontested that Geisinger did not report Dr. Cauley to the NPDB, the Court agrees that this portion of the agreement may not form the basis of any breach of contract claim. Doc. 75 ¶ 28; Doc. 86 ¶ 28.

[62]   Doc. 84 at 18-25.

Three elements are necessary to establish a claim for breach of contract under Pennsylvania law: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages."[63] For purposes of its motion for summary judgment, Geisinger does not contest that a contract existed, or even that damages may have resulted from any purported breach of that contract.[64] The relevant question, therefore, is whether Geisinger breached any of the terms of the alleged contract. The evidence establishes that it did not.

First, while Dr. Cauley asserts that Geisinger refused him the opportunity to inspect the peer reviews, as noted in the factual discussion, the undisputed evidence demonstrates that Geisinger provided him with opportunities to view the peer reviews, but he declined those opportunities.[65] Dr. Cauley points to no direct evidence that he was not provided with opportunities to examine the peer reviews,[66] and the circumstantial evidence to which he cites—that Drs. Patel and Mongeluzzo "could not identify a single instance of which they were aware that Dr. Cauley was

---

[63] *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (brackets omitted)).

[64] *See* Doc. 82 at 12-17.

[65] Doc. 75 ¶ 30.

[66] Again, although Dr. Cauley points to certain portions of his deposition testimony as supposedly supporting his assertion that he "testified that he was never provided an opportunity to review the peer reviews until discovery in this litigation," he has not provided the Court with the deposition pages to which he cites, which is his burden. Doc. 84 at 20. The Court cannot accept as fact an unsupported assertion made in a legal brief. *See Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993) ("Statements made in briefs are not evidence of the facts asserted" (brackets and internal quotation marks omitted)).

presented with the internal or external peer review" and were not aware that this was a condition of Dr. Cauley's resignation—does nothing but reinforce that Dr. Cauley did not inspect the peer reviews, while saying nothing about whether he was afforded the opportunity to so do.[67]

The agreement between Geisinger and Dr. Cauley required only that Dr. Cauley "be permitted to meet for the peer review with" Dr. Mongeluzzo.[68] The evidence demonstrates that Geisinger provided such an opportunity. In light of the undisputed evidence that Geisinger afforded opportunities for Dr. Cauley to examine the peer reviews, no reasonable jury could conclude that Geisinger breached this portion of the contract.

The Court turns then to the question of whether Geisinger breached its obligation to provide only neutral references for Dr. Cauley. Dr. Cauley bases his claim on two incidents. The first incident involved Dr. Millar and his conversation with Dr. Chusid at Northwell, while the second incident is Dr. Patel's conversation with Dr. Filippi at Tufts.[69]

First, the event involving Dr. Millar cannot constitute a breach of any agreement between Dr. Cauley and Geisinger.[70] That event involved a phone call

---

[67] Doc. 84 at 19-20.
[68] Doc. 87-8 at 2.
[69] *See* Doc. 84 at 21-24.
[70] Doc. 84 at 21-24. The Court assumes, for purposes of this motion, that Dr. Millar's statements do not constitute a neutral reference, particularly his statement that Dr. Cauley would not be a good fit for Northwell.

between Dr. Millar and Dr. Chusid, wherein Dr. Millar candidly spoke of both Dr. Cauley's strengths and weaknesses, and informed Dr. Chusid that Dr. Cauley would not be a good fit with Northwell's culture.[71]

The agreement with Geisinger, memorialized in an email exchange, required that Geisinger provide a neutral reference for Dr. Cauley.[72] Specifically, the agreement provided that "[t]he Employer will only provide a neutral reference. For any new potential employers that call before 9/30/2019, Geisinger will represent that [Dr. Cauley] is an employee. After 9/30/2019, only dates of employment will be provided."[73]

The key word in that agreement as related to this motion is "Employer," which is undefined. Although the term is undefined in the agreement, Black's Law Dictionary defines "employer" as a person or entity "for whom someone works; esp., one who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages."[74] The problem for Dr. Cauley is that, even before he left Geisinger, Dr. Millar was no longer his supervisor, as Dr. Millar had transferred out of that role in July 2019.[75] Because, both at the time that the agreement was drafted and when the recommendation was given, Dr. Millar did not

---

[71]   Doc. 85 ¶¶ 5, 30.
[72]   Doc. 77-15 at 2.
[73]   *Id.*
[74]   Black's Law Dictionary (11th ed. 2019).
[75]   Doc. 85 ¶¶ 5-6 (noting that Dr. Millar was Dr. Cauley's direct supervisor until Dr. Mongeluzzo assumed that role in July 2019).

control or direct Dr. Cauley and did not pay Dr. Cauley's salary, he does not qualify as Dr. Cauley's employer, and Geisinger cannot legally be held responsible for his statements.[76]

This is similar to the situation with which the United States Court of Federal Claims was confronted in *Rebish v. United States*, where a former employee of the United States Department of the Interior, Bureau of Reclamation, sued for breach of contract claiming, in part, that his employer had breached an agreement to provide only a neutral reference.[77] That agreement stated that the employer would provide the plaintiff "with a neutral reference that will be given by Ms. Elbe Hasse or her identified successor."[78] The plaintiff thereafter applied to a number of jobs and listed his former coworkers as references, but came to believe that those coworkers had "disclosed negative information about him to" potential employers.[79]

Based on the plain language of the agreement, the Court of Federal Claims determined that it "includes no language that obligates the Bureau to ensure that its employees generally refer inquiries from third parties to [a specific employee] . . . Nor does it include language prohibiting Bureau employees generally from providing references in their personal capacities and not on behalf of the Bureau."[80]

---

[76] *Cf. Monaco v. Limestone Veterinary Hosp.*, 152 F. Supp. 3d 253, 264 (D. Del. 2016) (discrimination claim failed when evidence established that coworker gave negative reference but the "reference was not given by, or on behalf of" the employer).

[77] No. 14-1022C (PRO SE), 2017 WL 4784276 (Fed. Cl. Sept. 25, 2017).

[78] *Id.* at *6.

[79] *Id.* at *2-3.

[80] *Id.* at *7.

Indeed, the evidence demonstrated that the plaintiff himself "specifically directed third parties to other individuals at the Bureau for purposes of securing what he expected would be positive references provided in their personal capacities."[81]

Because the agreement "did not impose an obligation on the Bureau to affirmatively prevent its employees from providing references (whether positive, negative, or neutral) in their personal capacities," the Bureau of Reclamation did not breach the contract by virtue of its employees—the very individuals who the plaintiff had listed as references—providing negative references to potential employers.[82]

Similarly, Dr. Cauley specifically chose as a reference Dr. Millar,[83] who was not Dr. Cauley's supervisor even before Dr. Cauley departed Geisinger, was no longer the director of neuroradiology, and could be best termed—if Dr. Cauley had still been employed by Geisinger—as Dr. Cauley's coworker. Geisinger did not direct Northwell to Dr. Millar, and Dr. Millar does not appear to have been speaking to Northwell in his official capacity as a Geisinger employee.

In fact, Geisinger fulfilled its obligation under the agreement by submitting a letter to Northwell that listed Dr. Cauley's dates of employment and noted that he had exercised clinical privileges during his employment.[84] And Geisinger took an additional step to satisfy the agreement by informing its employees that all requests

---

[81] *Id.*

[82] *Id.* at *8.

[83] *See* Doc. 87-2 at 24 (Dr. Cauley stating "I listed Bill Millar as my clinical reference").

[84] Doc. 75 ¶ 14; *see* Doc. 91-9 at 2.

for references should be directed to its human resources department.[85] Similar to *Rebish*, Dr. Cauley seems to believe "that the neutrality provision obligated [Geisinger] to take steps to prevent its employees from giving negative references while leaving them free to provide positive ones."[86] But that is not required by the agreement here, and Geisinger cannot be held in breach based upon Dr. Millar's statements.[87]

That leaves only the possibility that Geisinger may have breached the agreement through Dr. Patel's conversation with Dr. Filippi at Tufts. However, there is no evidence that Dr. Patel—who was the chairman of the radiology department and would qualify as the employer under the agreement—provided anything other than a neutral reference.

The undisputed facts establish that, after Dr. Filippi contacted Dr. Patel, the two spoke by telephone.[88] Dr. Patel could recall that the conversation involved discussion of Dr. Cauley, but could remember no details of the conversation except that, under the circumstances, he "would not be able to discuss" specifics regarding

---

[85]   Doc. 87-12 at 3.

[86]   *Rebish*, 2017 WL 4784276, at *7.

[87]   *See id.* at *8. *See also Shimmin v. Dep't of Just.*, 95 F. App'x 341, 342 (Fed. Cir. 2004) (affirming determination that employer had not breached neutral reference provision of settlement agreement because there was no "specific language prohibiting former co-workers from discussing [appellant's] previous INS employment in their personal capacity . . . [and] the two former co-workers who talked with the OPM investigator were acting within their personal capacity, not on behalf of the agency").

[88]   Doc. 85 ¶¶ 40-41.

Dr. Cauley's employment.[89] While Dr. Cauley describes Dr. Patel's lack of recall as "convenient[],"[90] the only disinterested party in this matter—Dr. Filippi—unequivocally testified that he had no knowledge of Dr. Cauley's resignation from Geisinger, of any peer review involving Dr. Cauley, or that Geisinger employees were purportedly not permitted to act as a reference for Dr. Cauley.[91]

Dr. Cauley points to a number of circumstantial facts that he maintains are sufficient to establish that Dr. Patel provided a negative reference to Dr. Filippi. He observes that Dr. Patel: (1) spoke with Dr. Filippi; (2) believed that Dr. Cauley should be reported to the NPDB and was so concerned with Dr. Cauley's work that he would not want Dr. Cauley to treat a member of his family; and (3) made Geisinger's legal department aware of the reference request although Geisinger never provided a reference to Tufts.[92] And, of course, Dr. Cauley was later asked to withdraw his application to Tufts.[93]

But these facts raise, at most, only the faintest of suspicions that perhaps Dr. Patel issued a negative reference. However, such suspicions fall far short of demonstrating that Geisinger issued something other than a neutral reference given

---

[89] *Id.* ¶ 42; Doc. 87-6 at 24.

[90] Doc. 84 at 23.

[91] Doc. 77-13 at 5-7.

[92] Doc. 84 at 23.

[93] *Id.*

Dr. Filippi's uncontroverted testimony that he knew nothing of the difficulties that Dr. Cauley had experienced during the end of his tenure at Geisinger.[94]

This is particularly so because Dr. Filippi had no reason to prevaricate with respect to this information; to the contrary, Dr. Filippi had previously been Dr. Cauley's clinical supervisor and, according to Dr. Cauley, agreed to serve as a reference for Dr. Cauley during his application to Tufts.[95] And of equal importance, Dr. Filippi urged Dr. Cauley to withdraw his application to Tufts not because of the conversation with Dr. Patel, but because Tufts would have reported Dr. Cauley to the NPDB, and Dr. Filippi "felt sympathetic" and wanted to avoid having that happen to Dr. Cauley.[96]

Given this evidence, the Court cannot conclude that there is any genuine issue of fact as to whether Dr. Patel, and therefore Geisinger, issued something other than a neutral reference for Dr. Cauley. In fact, there is simply no evidence that Geisinger issued a negative reference, at all. Because there is no genuine dispute that Geisinger did not breach its agreement with Dr. Cauley, his breach of contract claim fails, and Geisinger is entitled to judgment in its favor as to this claim.[97]

---

[94] Doc. 77-13 at 5-7.
[95] Doc. 85 ¶¶ 37-38.
[96] Doc. 77-13 at 4-5.
[97] The Court also questions whether the facts establish any damages, given that Dr. Cauley was able to immediately obtain employment, but quickly resigned from that position of his own volition. Doc. 75 ¶ 11; Doc. 86 ¶ 11.

## 2.      Promissory Estoppel

Finally, the Court turns to Dr. Cauley's promissory estoppel claim. Under Pennsylvania law, to establish a claim for promissory estoppel the plaintiff must demonstrate:

> that "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise."[98]

"These factors are strictly enforced to guard against the loose application of promissory estoppel."[99] As these elements make clear, for a claim of promissory estoppel to proceed, "some promise by a promisor [must be] broken."[100]

Again, Dr. Cauley's claim fails as a matter of law, for similar reasons as those that doom his breach of contract claim. Even if there were no underlying contract, and the agreement between Geisinger and Dr. Cauley constituted a mere promise on Geisinger's part, there is no evidence that Geisinger breached that promise. As discussed above, the evidence establishes that Geisinger provided Dr. Cauley with opportunities to examine the peer reviews, and Dr. Cauley has failed to establish that Geisinger ever offered anything other than a neutral reference.

---

[98]    *Cornell Narberth, LLC v. Borough of Narberth*, 167 A.3d 228, 239 (Pa. Commw. Ct. 2017) (quoting *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000)).

[99]    *Id.* (internal quotation marks omitted).

[100]   *C & K Petroleum Prod., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988).

Because Geisinger did not break any promise made to Dr. Cauley, Dr. Cauley has failed to establish the necessary requirements for a promissory estoppel claim. The Court will therefore grant summary judgment in Geisinger's favor as to this count.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Geisinger's motion for summary judgment.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge